Good morning, Jesse Agatstein, Federal Defenders of San Diego, on behalf of Ms. Morin. So this is a 1326D case that should go back to the district court because of the new developments in law and because the district court never considered prejudice. In this situation, this court usually remands like it did recently in Orozco-Orozco and Rivera-Valdez, and it should take the same approach. Sort of an unusual procedure posture, right? It's a 1326, the indictment didn't specify which predicate counted, correct? That's correct. Then you lost the dismissal motion. Does the record reflect, did you seek a conditional guilty plea at that point? Why'd you end up in a stipulated bench trial? I believe counsel did seek a conditional plea and one was not offered. And so in our district, it's in 1326D cases like this, a stipulated fax bench trial is about as common as a conditional plea in these circumstances, and district courts like this one here generally consider them in the same way. Let's say there hadn't been a motion to dismiss, so you've just gone to trial. What's the Ninth Circuit pattern instruction? Does the jury have to decide unanimously that one predicate qualifies? No. Any predicate counts? Yes. They just need to find that the person was physically removed after that predicate, right? But they don't even have to have unanimity as to one predicate? That's my understanding, because it's the district court that decides whether or not. Last question on this regard. So therefore you accept the posture here that if the government prevails as to any predicate, the conviction stands? That's correct. Okay. Thank you. Yes. But I would point out that the district court's order here is not clear which deportation order it was addressing. Right. And that's part of the tricky bit in this case. Yes. Okay. So... And assuming that's the deficiency in the 2009 prior, does that then, or the prior order, does that then infect the subsequent removal orders? Yes. Under Ochoa or Egel, because Ms. Marin, one of the forms of relief she could have been eligible for in 2009 was, could have been adjustment of status under this odd grandfathering relief provision. And so the earlier form of relief under Ochoa or Egel does affect the later due process errors. And so, honestly... How is that the case? So in Ochoa or Egel, this court held that when someone's green card was inappropriately taken away in an in absentia removal proceeding, a later removal based on, had some other due process errors at this point. But the earlier due process errors related to having a green card infected the later proceeding. That's Ochoa or Egel. And it talks about sort of the unique benefits that come to someone who has legal permanent residence. When you say infects, what do you mean? Invalidates per se? No, just not... It becomes part of the whole Nunez balancing issue? So this is a prejudice question, which the district court didn't get to, but in Ochoa or Egel, this court said the earlier prejudice is so severe that we would not let a later deportation stand, given that the earlier due process errors regarding had such severe prejudice that they would not allow the later deportation to stand. I believe that the case does use the language infects. So... But I would like... Sorry. And on whether there's sufficient information to determine whether her adjustment of status was viable or not, that's something that the district court is better equipped to do in the first instance? That's correct. And the parties have conflicting interpretations of the record on that point. I would like to address... So Valdivia Soto and Nunez both established after the district court decided how district courts analyze whether remedies are available. As for administrative exhaustion, before that, the district court had Portillo-Gonzalez, which says maybe the Ross v. Blake factors apply, we're not going to decide that here. And so the district court here just said there's no showing she exhausted her administrative remedies, which we agree, but the point is that the administrative remedies were not available to her in each of her three removal proceedings. Well, let's set aside the first one, but how about the other, particularly the second one? So at least under Nunez, where is the kind of affirmative misrepresentation that would fall under D-1? So we're mostly relying on a different Ross v. Blake factor, opaqueness, not affirmative misrepresentation. Because I agree, on this record, there is not an affirmative misrepresentation, but we're relying... We don't really have any case that's explored the opaqueness, but what's opaque about this? Yeah. So what's opaque about this is in the prison grievance context, for example, which is where Ross v. Blake is taken root out of, you can have a prison grievance manual, but not know where the form is to actually submit your grievance, and that's considered opaque. If you can't get the form, you don't know where to submit it, you have the general information about how grievances should work, but in your particular prison and where you're housed, you don't have the information you need to actually follow through with it. And that's what we're arguing on this record, and what this record shows is that Ms. Marin got an unknown piece of paper that we don't have. We also don't even have... Wait, are you referring to the 2011 still? Yes, the 2011. What's the unknown piece of paper that you're referencing? The judge said, do you have a copy of your appellate rights? And she said, yes, I have that piece of paper. We don't know what it said. For example, we don't know if it was saying, this is how you appeal to the Ninth Circuit, this is how you appeal to the BIA. And the government didn't even introduce what generally pieces of paper about appellate time or generally what kind of information was played to immigrants. But that transcript statement would be enough even in the Rule 11 context, right? In a Boykin colloquy. If... You've got appellate rights. If the person had counsel. So that's... In a... The difference is that in this proceeding, Ms. Marin was pro se, and this court does analyze waivers differently, depending on whether someone can take a step aside and ask their lawyer what's going on. But a defendant who's pro se gets the same Boykin colloquy. Once they have established that they understand, the judge takes more steps. She spoke English, though. The record reflects? That's correct. Yes. So am I wrong when I think, let's even assume the Ross opaqueness factor does apply? The government minimally briefed it, so let's assume it does apply. Why... Am I mistaken when I think we're still just looking at prejudice? And your client by the 2011 moment had a significant criminal history and the child was older. So why wouldn't the equities, as assessed already in Nunez, be applicable here? So this court could consider prejudice, the district court didn't, but this court could in the first instance. In 2011, I believe her son was 11, and she did have criminal history, of course, but she also had very significant equities. There's a reason in this case, in her sentencing, the district court varied down from 77 to 96 months, or 41 to 55. How many reentries did she have at that point? Because we factor that in too. How many times did she come in by that point? Yes, I believe it was three. I would have to double check. So you got three, and you have multiple drug convictions? Believe just one. Is there any, really? One felony. Excuse me. Yeah, okay. Can you think of any Ninth Circuit case that wouldn't say that the Nunez calculation shows that she's not likely to have gotten voluntary departure at that point? Yes, so Rayavaca, I would point this court to Rayavaca, that's a case where the defendant has... How do you spell that? Oh, yeah, sorry. I'm sure it's in your brief. Yeah, so it's R-A-Y-A-V-A-C-A, it's 771 F3rd at 1205. And in that case, the defendant, I believe, had four or five illegal reentries, had been alleged to have been an alien smuggler, but he also had a U.S. citizen son and a long-term partner in the U.S. He had received voluntary departure multiple times after his illegal entries, and that case was about a different form of prejudice, withdrawal of his application for relief, which goes to Ms. Marin's 2016 removal. And this court said there was some evidentiary basis on which he could have received that  And he had criminal history, too? He had less criminal history than Ms. Marin, he had some. I believe, and he had the allegations of smuggling. So but he didn't... But he had convictions, too? Yes. He did have convictions? Yes, that's my understanding. I apologize. I will double-check. No, no, no. That's... Thank you for the citation. Yeah. And I would say what's different here is Ms. Marin had really serious health problems. She still does, but she still did at that time. And she also had the mitigating factor of this really horrible domestic violence at the hands of her U.S. citizen husband. She got time served? Here. Does the record reflect where she is now? Yes, she's in Mexico. She has been deported? Yes, yes. And she's remained there. So if you were to prevail, the government would have to bring her in, just trying to understand the injury? Yes, it would parole her in for further proceedings. If this court doesn't have any further questions now, I can say it's now my time for rebuttal. Thank you, counsel. Thank you. Good morning, your honors, and may it please the court. Nicholas Pilchak for the United States. To have prevailed on our motion to dismiss or to win on the merits in this appeal, Ms. Marin has to satisfy all three prongs of 1326D across three different deportations, which means she has to win on nine issues and lose on none of them. She can't do that. Well, counsel, let me ask you this. In light of the change in the case law, why shouldn't we send it back for the district court to kind of analyze the exceptions to 1326D's exhaustion requirements in the first instance with the additional guidance from the Ninth Circuit? Would the government have any objection to that? Well, you certainly could, your honor. I think we'd just be in the same place six months or a year or 18 months from now, because I think there's only one conclusion, especially on prongs one and two. And for example, I don't think there's, on prong one or prong two, I don't think there are any additional facts that need to be developed. I don't think there's additional discovery or fact-finding that the district court would need to do. And in fact, I think Ms. Marin makes the point in her reply that we should have had a finding from the district court on whether administrative remedies were even available. I would submit that's implicit in the finding that we did get from the district court, which is that she failed to exhaust her administrative remedies. It would be curious if the district court found that she failed to exhaust a remedy that it didn't think was available. So I think we effectively have that finding from the district court already, and we could certainly send it back to the district court to say, what do you think of these two new cases that we've had, which are admittedly significant, but we submit, especially after Nunez, it points to only one conclusion. And I think you can see that in the way that Ms. Marin is arguing the case today, which is that we're not relying on Valdivia Soto per se. We're not relying on that exception to exhaustion, because as clarified in Nunez, it requires affirmative misrepresentations that Ms. Marin is admitting today are not present in the record. So this can't be an affirmative misrep or misleading case. It has to be an opaqueness case under the old Ross versus Blake factors. Old. It's not that old. I think it's 2016. But if we read what Justice Kagan said in that opinion about what's required to show opaqueness, it's simply not present on the undisputed record here. Some of the things that the problem is, the parties don't have the same interpretation as to what relief she could have obtained. So for example, as to the 2009 removal order, she said, well, I could have gotten voluntary departure or could have renewed the husband's application for adjustment of status. And the government said, well, you know, she hasn't really plausibly made a case here, but they're saying that they, in fact, did make a case. So had she been able to renew her husband's application, wouldn't that have affected the subsequent removal orders as well? If she had gotten all the way to a green card, it could have, or legal permanent resident status. I would just point out first, she had every opportunity and every incentive. But that's the prejudice inquiry, right? As to whether she could have adjusted her status. What are the chances of that? How plausible of a case she makes? It just seems to me that all of those questions, the district court is better equipped to explore those questions in the first instance than we are here at the Court of Appeals level. In general, yes. Again, Ms. Marin had every incentive and opportunity to develop that record in the trial court. And that's the record that this court is presented with now. None of those facts that were present in the discovery and the record in the district court are missing from the appellate record at this point. So this court has everything that the district court had. Admittedly, the district court didn't make an explicit finding on prejudice or that third prong in the trial court. But the court doesn't need to reach that if it decides the case on prongs one or two. To rule for Ms. Marin and even remand on that point, it would have to first, by her argument about the stiff removal in 2009, infecting the later proceedings, and I have some additional thoughts about that. And then it would have to say, well, then we're concerned about prejudice all the way back in 2009 because that's sort of a threshold issue for us. I don't think that's a good argument because Ochoa Origel, including as described by Ms. Marin's counsel this morning, involved someone who had a green card, who had legal permanent resident status, and then wrongfully lost it in an immigration proceeding that this court had trouble with. And so that's a different situation than Ms. Marin, who's saying, maybe I could have gotten legal permanent resident status if this application, which no one has seen and which evidently she was unable to turn up in the district court, had been sufficient all on its own to get that relief. That's the test that we cited in our brief. You have to show that the papers that you had filed were facially sufficient to establish your case for residency, and she didn't do that the first go-round. I would submit, if you send it back to the district court, everyone will look at the same facts again and come up with, now there will be a finding from the district court, one way or the other, on prejudice, and you're right, district courts traditionally make those determinations, but it'll be looking at the same facts that we're looking at now. And because I think the legal test is different than the authority Ms. Marin cites, and the facts on that are as well-developed as they're going to be, I don't think that the court should be hung up on that question. How does the government view this infection theory? Because you're not, you have a footnote in your brief saying, well, we're not, let's not focus on the 2009 removal, let's talk about the later ones, and then the appellant is here saying, well, actually, if things had gone differently for me in 2009, then none of these other things would have happened. And so how does the government view this dynamic of the case? I think this infection concept, if you take it broadly, is really a Pandora's box, and the logical conclusion of Ms. Marin's argument is that anyone who has an initial stipped deport can never be lawfully removed again after that, because we'll always be asking this what-if question of, what if things had gone differently in what is admittedly a pretty stripped-down, bare-bones proceeding, a stipulated deport is a very basic, efficient process, and the idea that that can prevent someone then, two years later, from going in front of an immigration judge and receiving all the rights and procedures that you get in front of an immigration judge, Ms. Marin had a focused, individual hearing where the judge addressed her individually, which is a much better process and procedure than the defendant in Nunez, who still failed to prevail on his 1326D motion, that even receiving all those procedures, that's still not enough, because we all have to rack our brains about what could have happened at the earlier... I mean, but does the government take the position that the chain of causation here is ultimately broken when she illegally re-enters again? Yes, I think it's broken by her, and I think she had multiple illegal re-entries between the stipped removal, I think she came back almost immediately after she was removed that time, and then came back illegally again, resulting in the IJ proceeding in 2011. So that's a break in the chain of causation, she certainly never did anything to resuscitate her old application, she just came back and committed additional crimes that resulted in her immigration contacts later. But then also, even if the court focuses on Ochoa Origel, the background circumstances there were very different than Ms. Marin's circumstances, as I just outlined, so I don't think that this is an infection case for purposes of preventing the court, for example, resolving it on prong one or prong two on the full IJ hearing she received. Could there be an infection case in a stipulated removal? Is that a possibility? Could somebody come forward with a showing, or do you think that's actually just a legal impossibility? I don't know that it's impossible, Your Honor, I think Ochoa Origel suggests that it could be possible, and I don't know, bless you, whether the removal in that case was a stipped deport, I just don't know. So I don't want to say it's impossible, but what I would say is this is a very poor candidate for it. But you heard my questions procedurally, because Nunes and Valdivius both were done what I would think properly. One of them was there was a dismissal, it was reversed, de novo review, preserved, dismissal motion, right? I don't know which one it was. The other one, let's see, was a conditional guilty plea. So why is it that we got all the way to verdict, and you're agreeing it's a standard of review as to the predicate as de novo? So it's a preservation standard of review question. Why didn't the government agree to a conditional guilty plea? I think that's just a matter of bargaining at our office, Your Honor. Sometimes we do, sometimes we don't. But then we end up at verdict. Yes. And so is the attack here still just purely legal and just assessed according to the record that was established in the dismissal hearing? I do think it is, and I do think the court can look to the entire record from the district court as we presented it to the court on this appeal. And you accept it's de novo review? Yes. Okay. Is there, I guess I was wondering, too, there is clearly tension between Nunes and Valdivius. Enormous tension. But it is two Ninth Circuit panels. Yes, and those are, I think, both binding on this court. So Valdivius Soto, rightly or wrongly decided, I think, is binding on this court. But I think what's clear from this— In other words, the rule of orderliness would apply, wouldn't it? The rule of orderliness? In terms of Valdivius would control. The panel in Nunes had no authority to adjust the Ross factors. That's correct, and I think you can see that tension in the decision in Nunes. Okay, but therefore, opaqueness is a valid way to defeat. I think it likely is, but I'd like to return to what opaqueness means in the Supreme Court's view. So thank you for that reminder. It means, for example, and this is a quote, some mechanism exists to provide relief, but no ordinary prisoner, because there it was prisoners, no ordinary prisoner can discern or navigate it. There's no showing of that in Ms. Marin's case. She was asked, do you wish to appeal or do you accept my decision as final in an individual face-to-face hearing? All she had to do was raise her hand and say, I'd like to appeal. I don't accept your decision as final. And she chose the opposite court. Is the opaqueness inquiry almost like a facial challenge to the procedures, or do you do that in a kind of individualized way? I think you could do both, right? I think you could say, and again, this is a bit of hypothetical reasoning, but there could be a prison with a handbook that lays out a clear procedure, but in practice it's impossible to follow. The important thing for Ms. Marin's case is that there was no opaqueness. The judge asked her multiple times, and this was quoted on page 10 of our brief, do you wish to appeal? If you don't appeal, you're likely going to be deported today. If you do appeal, and I'm paraphrasing, you can challenge my decision to a higher authority. It gave her all the information that she needed to understand either what she was opting to do or what she was giving up, and she made the giving up choice. And so that's clearly not opaque in the meaning of the Supreme Court. Now, Nunez has no tension with Valdivius when you get to the prejudice analysis. Is that correct? I think that's likely correct. Oh. So what criminal history and reentry combination wouldn't be disqualifying? After Nunez. There must be post-Nunez authority that I haven't looked at. In other words, is she just so obviously beyond the line in the authority, or are you familiar with this Ray Kava case? Ray Ivaca? Ray Ivaca. Yes. I do think her criminal history is more significant than Ray Ivaca. And I definitely think if we, and I hate to add a third deport to the mix, but if we go to her 2016 expedited removal where the government is raising a prejudice argument as to that, by that point, she had attempted to enter the United States fraudulently on a fake U.S. passport in connection with an alien smuggler. And so by that time, she had done something that under DHS's own manual, the six-factor test that they created to decide should someone receive the kind of relief that she's asking for, that's the first factor. And the law in the manual suggests it's ordinarily disqualifying. And she did that thing. So even aside from her criminal history, at the point that she commits that offense by her 2016 expedited removal, she's almost certainly not going to get voluntary departure. And then on top of that, she has five felonies. She has four drug crimes. Three of those are drug felonies. She's distributed methamphetamine near an elementary school. And then she has the false document conduct. And she has a crime involving moral turpitude from her counterpart. What would you say is the mitigation by 2016? Well, she does have mitigation. It seems by then, she's been a year or two off of her severe methamphetamine habit. So she's clean in a narcotics sense. She has the family situation. I think her son is probably 16 by then, and she is his sole parent. I think he was with his grandparents at that point, but she was his only parent who was in the mix. So she has some family equities. I just think they're outweighed by the severe criminal history, the false document entry that DHS ordinarily rules disqualifying by itself to show she couldn't have received voluntary departure by that point. So I think the court could also rule, even though the district court didn't, on prejudice, especially for that 2016 expedited removal. So I think it can easily find in the law that her administrative remedies were not opaque in 2011 when she received a full IJ, for the same reason she was not deprived of judicial review. They gave her, I admit we don't have the sheet, but they gave her a written advice of appellate rights. It couldn't have been clearer from the transcript of the IJ what she was giving up. So very simple to rule for prongs one or two in the 2011 IJ, or for prejudice in the 2016 ER. Any of those things are dispositive for this appeal, and would not require remand to the district court for additional fact-finding. Unless the court has additional questions at that point, I will stop. Thank you, counsel. Thank you. So I'll pick up where my friend on the other side left off, which is I think at the end of the day, the district court didn't consider any of the core issues we're talking about today. The opaqueness, the validity of Ms. Morin's appellate waiver or prejudice in either 2011 or 2016. And I would disagree. There are facts for the district court to decide on and fully develop. Ms. Morin, we are arguing that her appellate waiver was not knowing and intelligent. The government had an opportunity and on remand could have further opportunity to introduce here's what this piece of paper usually said, even if we can't find the exact one. Didn't you have the opportunity in the district court to come forward with all of this too? So we couldn't have come forward with the information from what the immigration court usually... Or to tell the district court this is what we need? We did. I mean, so we did do discovery and we could not find the piece of paper anywhere saved in Ms. Morin's immigration file. And so particularly as to D2, which it is the government's burden to show that her appellate waiver was knowing and intelligent under D2, the fact the government didn't come forward then is something the district court should have considered at that point. We don't get to D2 if there's a D1 problem after Nunez and whatever the full meaning of that is, where would we have opaqueness in a remand? Yeah, so opaqueness would be that Ms. Morin did not know. So there's a very specific form you have to use to send to the BIA to appeal your case. There's nothing in this record that Ms. Morin had the information about where to get that form, what it is, how long you have to submit it. The BIA has unusual rules where they actually... Does that matter though, given the colloquy with the IJ? Yes, because that went to whether she was giving up the... Whether she was agreeing to appeal or not appeal, but not about what the specific procedures for appealing were. So that's sort of the D1, D2 difference, right? D1 is about whether administrative remedies were available to her. I'd actually point this court to... Obviously this law is much more developed in the PLRA context, and so I'd point this court to Eaton versus Blewett, which we cite in our reply brief. And that sort of includes a summary of different ways administrative remedies are available and aren't. It analyzes specific to individual people. Because for example, if you're in solitary confinement, your administrative remedies availability is going to look different than if you can easily access your counselor. And so obviously we're in a different context here. We're in immigration court where someone's pro se, but that analysis is individualized. How about by the time we get to the 2016 and the prejudice? Could your client not have come forward with a showing of that in the district court? She did. She included significant declarations from her family about her upbringing, how her son had been affected by her deportation, about her poor health. So what would a remand accomplish on that? The district court didn't decide prejudice. It only decided on D1 and D2. So we have all these facts. The government argues her criminal history is serious. We argue she's really mitigating an unusual life. And again, there's a reason the district court varied down so far at the time of sentencing. It's because she had a very mitigating circumstance that outweighed her criminal history category. But is the record not the record on this? If we remanded it, the district court would look at the record, the district court would decide whatever the district court decides, and then this court would look at the same record? Yes, the government could submit more information about her criminal history if it wanted to. But again, usually this court does remand for prejudice inquiries like this where there's lots of declarations and information. I do think this court could find that Ms. Marin, on this record, established some evidentiary basis for withdrawal of her application. I'd point this court to Riavaca, where this court found that, and in it, it pointed out that withdrawal of an application is not a sparing remedy. It's not an unusual remedy. At the time, DHS stopped publishing data about how commonly this relief was granted. It was granted in about half of cases. So you think we could make the prejudice finding in your client's favor here? Yes. Okay. Given that, could we also make the prejudice finding against your client based on the same record here? You could. Just this court usually doesn't, but you could. Just again, tell me Ninth Circuit law in this area. So if we were to accept your argument, we would be vacating the conviction, correct? Correct. Vacate the conviction, remand for a reopening of the dismissal hearing? That's correct. And the defendant would have a right to presence, so the government would have to parole her back? That's correct. Okay. And that happens? Yes. I mean, this all does happen in our 1326D motions. I'm trying to remember the last time someone was paroled in for this exact purpose. I mean, the government does parole people in as witnesses for trials all the time. And Ms. Byrne was living in Tijuana, it would not be a big stretch to get her to San Diego. Thank you. All right. Thank you very much, counsel. Thank you. To both sides for your argument this morning. The matter is submitted.
judges: Higginson, NGUYEN, BRESS